IN THE SUPREME COURT OF MISSISSIPPI
NO. 96-KA-00400-SCT

*LEONARD WALTERS, a/k/a LEONARD JAMES WALTERS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/07/92 |
| TRIAL JUDGE: | HON. RICHARD WAYNE McKENZIE |
| COURT FROM WHICH APPEALED: | CIRCUIT COURT OF FORREST COUNTY |
| ATTORNEY FOR APPELLANT: | SALLY J. O'FLYNN |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | GLENN L. WHITE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 8/20/98 |
| MOTION FOR REHEARING FILED: | 9/17/98 |
| MANDATE ISSUED: | 11/5/98 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. This case comes to this Court on appeal of Leonard Walters from the Circuit Court of Forrest County. Walters was indicted as an habitual offender pursuant to Miss. Code Ann. § 99-19-81 for the crime of murder with malice aforethought. Walters was tried by jury on November 30, 1992 and a verdict was returned finding Walters guilty of murder. The trial court sentenced Walters as an habitual offender to life imprisonment without the benefit of parole or probation. Walters timely filed a Motion for New Trial or in the Alternative Judgment Notwithstanding the Verdict on December 30, 1992, but the motion was never ruled on by the trial court. On March 21, 1996, Walters was appointed additional counsel to represent him at a hearing on his Motion for a New Trial. On April 3, 1996, after conducting the hearing on the motion, the trial court entered an order denying said motion. Aggrieved by the trial court's decision, Walters appeals to this Court and raises the following issues:

**I. WHETHER THE CIRCUIT COURT ERRED IN ALLOWING THE INTRODUCTION INTO EVIDENCE OF A VIDEOTAPE OF THE BODY OF THE**

**DECEASED AT THE CRIME SCENE.**

**II. WHETHER PROSECUTORIAL MISCONDUCT VIOLATED WALTERS' RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 3, SECTION 26 OF THE MISSISSIPPI CONSTITUTION OF 1890.**

**III. WHETHER THE PROSECUTOR USED ITS PEREMPTORY CHALLENGES IN A DISCRIMINATORY MANNER AS TO VIOLATE WALTER'S CONSTITUTIONAL RIGHTS.**

**IV. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING WALTERS' MOTION FOR A DIRECTED VERDICT AND WHETHER THE VERDICT OF THE JURY WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

**V. WHETHER WALTERS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION.**

## FACTS

¶2. Flora Stine Brown McCoy's body was found in a wooded area behind the Frances Street Apartments in Hattiesburg, Mississippi on September 27, 1991. Her body had been dragged some twenty to twenty-five feet from an area where a struggle had taken place, placed in a ditch and covered with leaves and tree limbs. Her blouse, which was tied at the waist, and denim mini-skirt were pulled up, revealing her bare breasts and genital area. A bag containing ladies' underpants and man's shirt, both stained with feces and blood, was found with the body.

¶3. Dr. Stephen Hayne, the forensic pathologist who performed an autopsy on McCoy, determined the cause of death to be a "cerebral trauma secondary to blunt force trauma to the back of her head." He stated that the injury was more consistent with inflicted trauma than with a fall backwards. He further testified that the injury could have been caused by an object such as the piece of blood-stained concrete found at the scene.

¶4. Dr. Hayne identified some twenty stab wounds and four slash wounds, primarily on the front of the body around her neck and chest. None of the wounds were lethal; only a stab wound that penetrated the abdominal cavity was potentially life-threatening. There were also multiple abrasions and superficial scrapes on her face, chest and arms. He further found that the decedent had sexual intercourse within the last day or two before her death and that she had a blood alcohol level between .33 and .39.

¶5. Investigators learned that McCoy had been seen arguing with Walters at the Bon Ton Club (a/k/a the S & B Lounge) on September 26th, the night of her death, as well as at Sonny Boy's the previous night. Walters was described as acting wild and being angry or in a rage. There were varying stories as to whether they left the Bon Ton Club together or whether McCoy left with another man and Walters left shortly thereafter. The only eyewitness called to testify, Sabrina Ratliff, a good friend of

McCoy's, stated that she had seen her earlier in the evening, drunk and arguing with her twin sister at a club called Rippy D's. She saw her leave, walking in the direction of the S & B Lounge.

¶6. The police found Walters watching cartoons at the home of his sister, Catherine Walters, on Rosa Avenue, near the crime scene. He was taken to the police station and arrested as a material witness on September 27th. Officer Charles DeJarnette went back to Walters' house and obtained her verbal consent to search the house. In a bathroom, she and DeJarnette found some blood-stained shorts and a shirt soaking in a five-gallon bucket.

¶7. Upon initial questioning, Walters told police that he had not been around McCoy and that "he loved her, and wouldn't do anybody like that." He further denied being with her or arguing with her. Hours later, after he was advised by police that they had learned from his sister that he was seeing McCoy, Walters admitted that he had been with her but denied that he had hurt her.

¶8. On September 29th, Walters asked to see Captain Sonny Lindley, for whose father he had done yard work. He told Lindley that he had had a sleepless night and needed to get something off his conscience. Since Lindley was not assigned to the case, he summoned Detective Richard Cox to take Walter's statement wherein he stated that he had sex with McCoy and stabbed her after she swung at him when he refused to buy a rock of cocaine for her. Five hours later, he also made a confession to Officer Darrell Wallace, who had not had an opportunity to review the statement given earlier to Detective Cox. Consistent with the first statement, Walters stated, in relevant part:

> I told her I would try to get her a rock (cocaine) if she would have sex with me. After we had sex, she called me a liar for not getting her a rock. She swung at me with her fist. She was very mad, and I feared for my life. So I took my knife out of my pocket and started cutting and stabbing her. When she quit moving, I panicked and drug her to a ditch in the woods behind the complex. I threw her in it, then covered her up and ran home.

¶9. Bite mark analysis performed by forensic odontologist Dr. Michael West provided a positive match between bite marks found on McCoy's shoulder, wrist and forearm and a cast made of Walter's teeth. Further, bruises and abrasions on McCoy's back and cheek corresponded with a large gold ring Walters was wearing at the time of his arrest.

### DISCUSSION OF THE LAW

**I. WHETHER THE CIRCUIT COURT ERRED IN ALLOWING THE INTRODUCTION INTO EVIDENCE OF A VIDEOTAPE OF THE BODY OF THE DECEASED AT THE CRIME SCENE.**

¶10. Walters asserts that the circuit court judge erred in allowing the State to introduce into evidence a videotape of the crime scene despite the judge's acknowledgment that it depicted a "pretty grotesque scene" and his concern that allowing the jury to view the video over and over would be prejudicial. Walters contends that the videotape is highly prejudicial and that such prejudicial effect outweighs any probative value of the videotape. The videotape contained: (1) a view of the area where the struggle took place; (2) a view of the path from the area where the struggle took place to where McCoy's body was found; and (3) a view of McCoy's body and the surrounding area.

¶11. The State contends that the circuit court judge did not err by allowing the introduction into evidence of the videotape because the probative value outweighed the prejudicial effect since the videotape was the only depiction of the crime scene due to the overexposure of photographs taken at the scene. The State asserts that the videotape was necessary to negate Walters' claim of self defense by showing a full view of the body and the condition in which McCoy's body was found.

¶12. This Court has held that the same standards used in determining the admissibility of photographs are applicable to the admission of videotapes. *Underwood v. State*, 708 So. 2d 18, 33 (Miss. 1998); *Blue v. State*, 674 So. 2d 1184, 1210 (Miss. 1996); *Holland v. State*, 587 So. 2d 848, 864 (Miss. 1991). "[T]he admissibility of photographs rests within the sound discretion of the trial judge, whose discretion will be upheld absent abuse of that discretion." *McFee v. State*, 511 So. 2d 130, 134 (Miss. 1987) (citing *Watson v. State*, 483 So. 2d 1326, 1328 (Miss. 1986); *Kelly v. State*, 463 So. 2d 1070, 1074 (Miss. 1985); *Stevens v. State*, 458 So. 2d 726, 729 (Miss. 1984); *Sharp v. State*, 446 So. 2d 1008, 1009 (Miss. 1984)). "The 'discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value.'" *Brown v. State*, 682 So. 2d 340, 353 (Miss. 1996) (quoting *Hart v. State*, 637 So. 2d 1329, 1335 (Miss. 1994)). "Yet, photographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence." *McFee*, 511 So. 2d at 134 (citing *Cabello v. State*, 471 So. 2d 332, 341 (Miss. 1985); *Billiot v. State*, 454 So. 2d 445, 459-60 (Miss. 1984)). Furthermore, this Court has stated:

> Keeping in mind the considerations delineated in *McFee* when determining admissibility and the provisions of Rule 403 of the Mississippi Rules of Evidence,[(1)] a court must also consider (1) whether the proof is absolute or in doubt as to identity of the guilty party, and (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury.

*Blue*, 674 So. 2d at 1210 (citing *McNeal v. State*, 551 So. 2d 151- 159 (Miss. 1989)). "A photograph, even if gruesome, grisly, unpleasant, or even inflammatory, may still be admissible if it has probative value and its introduction into evidence serves a meaningful evidentiary purpose." *Noe v. State*, 616 So. 2d 298, 303 (Miss. 1993) (citing *Lanier v. State*, 533 So. 2d 473, 484 (Miss. 1988); *Koch v. State*, 506 So. 2d 269, 271 (Miss. 1987); *Cardwell v. State*, 461 So. 2d 754, 760 (Miss. 1984)).

¶13. The videotape was introduced through the testimony of Detective Rigel over the objection of the defense counsel that the videotape was highly prejudicial. Before introduction into evidence, the trial court conducted a hearing outside the presence of the jury to determine the admissibility of the questioned videotape. Defense counsel argued that the videotape was highly prejudicial because it depicted that rigor mortis had already begun to set in and that investigators appeared to be pulling some sort of "animal type creatures or jelly substance from around the decedent's neck."

¶14. The State, however, argued that the videotape was necessary to negate Walters' claim of self defense by showing a full view of the body and the condition in which McCoy's body was found. The State further argued that the videotape was necessary because the still photos taken of the crime scene were not available because after sending them to be developed they were returned overexposed. After weighing the probative value against the prejudicial effect of the videotape, the

trial court allowed the videotape to be introduced into evidence since there were no other photographs of the crime scene and Walters was claiming self defense.

¶15. We hold that the trial court did not err by admitting into evidence the videotape of the crime scene and McCoy's body because, due to a lack of still photographs (all had been overexposed) depicting the crime scene and the condition in which the victim's body was found, the probative value outweighed any prejudicial effect.

¶16. Walters admitted being with the victim but maintained that she asked for cash in exchange for sex. Walters claimed that after they had consensual intercourse, he refused to pay and during an ensuing argument she swung at him. He claimed that he reacted in self defense by stabbing her with an eight inch knife, that panic overcame him when she quit moving, and that he hid the body in the woods. Walters claimed that he feared great harm or danger and that his very life was threatened.

¶17. The videotape aids in depicting a crime scene inconsistent with Walters' theory of self defense and clearly shows a continuous path of the crime scene, the injuries inflicted upon McCoy and the force necessary to inflict these injuries. The State's evidence indicates that there was blood, a cap, eyeglasses and a barrette located near the roadway adjacent to the crime scene, sufficiently noticeable to attract the attention of Jimmie Kirkland who observed such as he walked near the Francis Street Apartments. The videotape depicted how McCoy had been dragged through the woods some twenty to twenty-five feet from the site where the original altercation had taken place. Inside the woods, an apparent additional struggle occurred, and the victim was dragged to the ditch where her nude, tied up body was found face down and covered with leaves. In addition, a bloody piece of concrete was found near the body.

¶18. Dr. Stephen Hayne, expert forensic pathologist, testified that the victim had a blood alcohol level of between .33 and .39 per cent, indicating considerable impairment. He opined that the victim would have had difficulty with thought processing and the ability to carry out purposeful action. In fact, in his view, she was near fatal level and could have been on the verge of a coma. McCoy was only 5 feet 3 and one half inches tall and weighed 125 pounds. Considering the twenty stab wounds, most of which were to the back, Dr. Hayne found that only the wound to the mid-abdominal wall was potentially fatal. He further found two large lacerations to the back of the victim's head. He testified that the cause of death was blunt force trauma to the back of her head. He also opined that the injury could have been caused by an object such as the piece of blood-stained concrete found near McCoy's body.

¶19. There was thus two substantially different versions submitted to the jury concerning the death of McCoy, the State's version and Walters' version. "A defendant is not entitled to use deadly force in self-defense based upon a subjective fear of great bodily injury unless it is determined by a jury that this fear is reasonable under the circumstances." *Ellis v. State*, 708 So. 2d 884, 887 (Miss. 1998). Even assuming the jury might have concluded that McCoy, in her intoxicated state, was even capable of rational thought process sufficient to make a deal with Walters for sex in exchange for money, the jury could have also concluded that she was not capable of putting up a struggle that would justify the "resistance" that Walters exercised. In fact, the video was the only evidence available that refuted Walters' claim of self-defense; a claim that required Walters to be in fear of great bodily injury. Under the facts of the case at bar, considering McCoy's physical attributes and her level of extreme

intoxication, the jury could have concluded she was not capable of the type of struggle that would reasonably lead Walters, who was five feet nine inches tall and weighed over two hundred pounds, to fear for his life. Accordingly, the circumstances surrounding the struggle and the type of wounds inflicted upon the victim (as a result of the struggle according to Walters) were crucial factors to be considered by the jury in determining the credibility of Walters' claim of self-defense.

¶20. Therefore, we agree with the trial judge and hold that the probative value of the videotape outweighed any prejudicial effect of the videotape in light of Walters' claim of self defense. The videotape was probative in assisting the jury to visualize the path of the crime scene, aiding the jury's consideration of the injuries inflicted and the force necessary to inflict such injuries, and refuting Walters' claim of self defense. More importantly, the videotape was the only crime scene pictorial evidence available to the State because the only crime scene photos taken had been overexposed and were useless.

¶21. This Court has held that "in a slaying . . . in which the only eyewitness was the defendant, and it was argued that the slaying was something other than murder, the relevancy of photographs showing the scene and victim is increased." *Underwood*, 708 So. 2d at 33 (quoting *Griffin v. State*, 557 So. 2d 542, 550 (Miss. 1990)). This Court has also stated, "[m]oreover, the video was necessary in helping the jury to visualize the bloody crime scene when hearing testimony regarding the injuries [the victim] received, how and where she received them, and the force necessary to inflict her injuries." *Blue*, 674 So. 2d at 1210. In the case at bar, as in *Underwood*, Walters was the only eyewitness and he argued self defense, and thus, the relevancy of the video showing the scene and the victim is increased. *See Underwood*, 708 So. 2d at 33. As in *Blue,*the video was necessary in aiding the jury to visualize the crime scene when hearing testimony regarding the multiple injuries that McCoy received, how the injuries were inflicted, the location she received them, and the amount of force necessary to inflict the injuries. *See Blue*, 674 So. 2d at 1210. Additionally, the record reflects that the videotape was played without sound as to eliminate any prejudicial comments being heard by the jury. *See id.* The record does not reflect that the jury viewed the videotape except during the testimony of Detective Rigel. As the videotape was probative and not unduly prejudicial, admission of the videotape into evidence was not error. As a result, this issue is without merit.

### II. WHETHER PROSECUTORIAL MISCONDUCT VIOLATED WALTERS' RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 3, SECTION 26 OF THE MISSISSIPPI CONSTITUTION OF 1890.

¶22. Walters first contends that statements made by the prosecutor during closing argument amounted to an improper comment on his failure to testify and violated his right against self-incrimination. Walters further contends that the prosecutor improperly displayed a knife, which was not in evidence, while making demonstrations to the jury during closing argument. The State first asserts that Walters is procedurally barred from raising the issue regarding improper comments before this Court because he failed to object on this ground at trial, and furthermore, the prosecutor's comments can not be reasonably construed as a comment on the exercise of Walters' right against self-incrimination. The State further asserts that Walters did not properly preserve the issue regarding the display of the knife before this Court because defense counsel failed to obtain a ruling on his objection or request any corrective action.

¶23. During the prosecution's closing argument, the prosecutor reached into his pocket, displayed a pocket knife, and then stated:

> I do know that he had intent to kill. Because even if she started to swing at him, what does he do. He sticks his hand in his pocket, takes out a knife. What are you doing. You have a thought process telling your hand to reach into your pocket for a knife, correct? For what purpose do you reach in for a knife when you see a hand coming at you from a woman who is 5'3" and 125 pounds, and you are 5'8", 5'9" weighing over 200. Do you have reasonable fear for your life? No. What is the thought process going when he opens the knife blade. What goes through one's mind when he opens the knife and places it in his hand. *How do we know what he's thinking when he stabs her one time in the abdomen, several times on the arm, in, out, in, out, 20 separate times, and slashes the throat.*

Walters contends that the above emphasized portion was an improper comment by the prosecutor on his failure to testify at trial. However, Walters did not object to the prosecutor's comments during closing argument but rather only objected to the prosecutor's display of the pocket knife. Thus, because Walters did not make a contemporaneous objection to the prosecutor's closing comments, Walters is procedurally barred from raising this issue on appeal. *See* ***Lester v. State***, 692 So. 2d 755, 795 (Miss. 1997); ***Blue***, 674 So. 2d at 1213.

¶24. Alternatively, on the merits, procedural bar notwithstanding, it is clear from the context of the statement to which Walters now objects that the prosecution was commenting about intent and not about Walters' failure to testify. We have held that similar statements do not constitute an impermissible comment on a defendant's right not to testify. In ***Thorson v. State***, the prosecutor made the following remarks during his closing argument: "Do you think she was suffering? Do you think that's cruel and atrocious, and what's even more than that, what do you think was running through Roger Thorson's head as he sat through watching her gag on her own blood? *What do you think he was thinking?*" ***Thorson v. State***, 653 So. 2d 876, 895 (Miss. 1994) (emphasis added). We held that this was not a comment on Thorson's failure to take the witness stand in his own defense. ***Thorson***, 653 So. 2d at 895. Likewise, the comments made by the prosecutor in the case sub judice were not a comment on Walters' failure to take the witness stand and testify in his own defense.

¶25. Walters next asserts that the prosecutor's exhibiting of a knife before the jury during closing argument was highly prejudicial and warrants reversal. Although Walters objected, the circuit court did not rule on the matter but did admonish the prosecutor by stating, "All right, don't be---." We have held that where an objection was made and a definitive ruling was not obtained nor was there any corrective action requested that the defendant waived his objection. ***Gayten v. State***, 595 So. 2d 409, 413 (Miss. 1992). Walters waived this objection and is, thus, procedurally barred from subsequently raising it on appeal.

¶26. The bar notwithstanding, we find that the prosecutor's action did not constitute reversible error. In ***Woodward v. State***, the district attorney, during closing argument, loaded the defendant's pistol with the empty shell that had killed the victim and tossed the pistol in the air to demonstrate Woodward's action when he was arrested. ***Woodward v. State***, 533 So. 2d 418, 433 (Miss. 1988). The circuit court overruled Woodward's motion for a mistrial and admonished the district attorney. ***Woodward***, 533 So. 2d at 433. Though finding the district attorney's actions were "questionable

conduct for a court of law," we found that the incident was properly handled by the circuit court. **Id.** In this case, the theatrics involved appear to be far more subtle than those described in **Woodward**. It is unclear, however, from the record what exactly the district attorney did and what the jury saw. Based on **Woodward**, however, the circuit court's admonition, though feeble, was a proper response, and the incident does not amount to reversible error. As a result, this issue is without merit.

### III. WHETHER THE PROSECUTOR USED ITS PEREMPTORY CHALLENGES IN A DISCRIMINATORY MANNER AS TO VIOLATE WALTER'S CONSTITUTIONAL RIGHTS.

¶27. Walters, a black male, asserts that the State used its peremptory challenges in an unconstitutional manner to exclude potential black jurors from the jury in violation of **Batson v. Kentucky**, 476 U.S. 79 (1986). Walters contends that the trial court erred in accepting the State's offered racially neutral reasons for striking black veniremen. The State, however, asserts that the trial court properly found the peremptory strikes were not racially motivated.

¶28. In order to establish a prima facie case of racial discrimination in the exercise of peremptory strikes against potential jurors, a defendant must show:

> [H]e is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

**Batson v. Kentucky**, 476 U.S. 79, 96 (1986) (citations omitted). This Court, in **McFarland v. State**, stated:

> Under **Batson**, the party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory strike. The burden then shifts to the party exercising the challenge to offer a race-neutral explanation for striking the potential juror. Finally, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory.

**McFarland v. State**, 707 So. 2d 166, 171 ( Miss. 1997) (citations omitted). "We accord great deference to the trial court in determining whether the offered explanation under the unique circumstances of the case is truly a race-neutral reason." **McFarland**, 707 So. 2d at 172 (citing **Stewart v. State**, 662 So. 2d 552, 558 (Miss. 1995)). Furthermore, "[w]e will not reverse a trial judge's factual findings on this issue 'unless they appear clearly erroneous or against the overwhelming weight of the evidence.'" **Id.** (quoting **Stewart**, 662 So. 2d at 558).

¶29. At trial, Walters argued that the State's exercise of seven out of ten peremptory challenges raised a presumption that it sought to systematically exclude blacks from the jury. The State was then required by the trial court to offer racially neutral explanations for striking the potential jurors. Looking individually at the black venire members peremptorily struck by the State, we do not find

any error by the trial court in concluding that the State's reasons were racially neutral.

¶30. The State challenged Aserelene Pickett because "she was digging in her purse on voir dire, was dozing" and had become "quite perturbed and was talking to herself." The trial court also specifically stated that Pickett was at one point "sound asleep." This Court has held that sleeping during voir dire alone was a racially neutral explanation and sufficient to sustain the challenge. *See Mack v. State*, 650 So. 2d 1289, 1299 (Miss. 1994); *Griffin v. State*, 607 So. 2d 1197, 1202 (Miss. 1992).

¶31. The State challenged Shirley Amos because she worked at a Krystal where there had recently been an incident involving a Hattiesburg police officer and lived in a high crime area. The State also challenged Lutherea Hayes because she was unresponsive during voir dire and lived in a high crime area. This Court has held that the fact that a potential juror lives in a high crime area is a sufficient racially neutral explanation and adequate to survive a *Batson* challenge. *See Lockett v. State*, 517 So. 2d 1346, 1353, 1356 (Miss. 1987).

¶32. The State challenged Allena Gamblin because she had an altercation with an assistant district attorney while visiting the district attorney's office to talk about a child support problem she was having. We have held that a bad relationship with the prosecutorial arm of the State is a racially neutral basis for striking a potential juror. *See Abram v. State*, 606 So. 2d 1015, 1036 (Miss. 1992); *Johnson v. State*, 529 So. 2d 577, 584 (Miss. 1988). The State challenged Katie Howard because during voir dire she had been "rolling her eyes" and displaying "totally opposite body language." We have consistently held that an individual's demeanor is an appropriate racially neutral reason. *See Davis v. State*, 660 So. 2d 1228, 1242 (Miss. 1995); *Mack*, 650 So. 2d at 1299.

¶33. The State additionally challenged Jessie Portis "to get down to the next one," whom the district attorney knew was a crime victim, and John Bolton, whom was a friend of the district attorney and a relative of the chief jailer, so that a registered nurse could sit on the jury. The district attorney explained the reason for striking Bolton and seating the registered nurse was "because of her medical credentials, because we would have a lot of pathology and a lot of odontology that I felt she would be more acceptable to in this particular case." We have held similar tactical reasons for striking potential jurors to be racially neutral. *See Simon v. State*, 633 So. 2d 407, 411 (Miss. 1993), *vacated on other grounds*, 513 U.S. 956 (1994).

¶34. Thus, finding that the offered explanations by the State were sufficient race-neutral reasons for striking the potential jurors, we hold that the circuit court did not err in finding the State's use of its peremptory challenges was not racially motivated. As a result, this assignment of error is without merit.

### IV. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING WALTERS' MOTION FOR A DIRECTED VERDICT AND WHETHER THE VERDICT OF THE JURY WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶35. Walters contends that the trial court erred by denying his motion for a directed verdict and, furthermore, the verdict of the jury was against the overwhelming weight of the evidence. Walters asserts that the State failed to meet its burden of proof required to sustain a conviction of murder in that the State did not prove the element of malice aforethought. Walters further contends that

pursuant to the *Weathersby* Rule, the trial court and jury was mandated to accept Walters' version of events that he stabbed McCoy while resisting her initial assault on him and was acting in defense of his own physical safety. The State, however, asserts that the trial court did not err in denying Walters' motion for a directed verdict and, furthermore, that the evidence was sufficient to sustain Walters' conviction of murder with malice aforethought.

¶36. First, "[r]egarding the motion for directed verdict, the trial judge must accept as true all evidence favorable to the State and all reasonable inferences flowing therefrom. Evidence favorable to the defendant must be disregarded." *Ellis v. State*, 667 So. 2d 599, 612 (Miss. 1995) (citing *Isaac v. State*, 645 So. 2d 903, 907 (Miss. 1994) (quoting *Noe*, 616 So. 2d at 302)). When considered in this light, the evidence was sufficient to support the jury's verdict, and therefore, the motion for directed verdict was properly overruled. *SeeEllis*, 667 So. 2d at 612. Despite the lack of an eyewitness, Walters' confession, when viewed in the light most favorable to the State along with the other physical evidence, was sufficient evidence to support a verdict of guilty.

¶37. Walters next asserts that the jury's verdict was against the overwhelming weight of the evidence. Walters' assignment of error challenges the weight and sufficiency of the evidence. When reviewing a challenge to the weight and sufficiency of the evidence, we adhere to the following standard of review:

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence--not just that supporting the case for the prosecution--in the light most consistent with the verdict. We give the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. ***On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairminded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict is thus placed beyond our authority to disturb.***

*Hart v. State*, 637 So. 2d 1329, 1340-41 (Miss. 1994) (emphasis in original) (quoting *Garrett v. State*, 549 So. 2d 1325, 1331 (Miss. 1989)).

¶38. Walters argues that the jury's verdict of guilty of murder was against the overwhelming weight of the evidence because the State failed to meet its burden of proof to sustain a conviction of murder in that the State did not prove the element of malice aforethought. Walters relies on *Gossett v. State*, 660 So. 2d 1285 (Miss. 1995), to provide his definition of "malice aforethought" as the equivalent of deliberate design. In *Gossett*, where we affirmed the appellant's murder conviction despite his assertion that it was manslaughter, and not murder, when the victim was shot during a scuffle, "deliberate design" was defined as follows:

> [D]eliberate always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. 'Design' means to calculate, plan, contemplate . . . deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent.

*Gossett v. State*, 660 So. 2d 1285, 1293 (Miss. 1995) (quoting *Windham v. State*, 520 So. 2d 123, 127 (Miss. 1988)). In addition, we have held that "[m]alice may be established expressly or impliedly from the evidence." *Harrison v. State*, 534 So. 2d 175, 183 (Miss. 1988) (citing *Motley v. Smith*, 1172 Miss. 148, 152, 59 So. 553, 554 (1935)).

¶39. We have also held that it is a "well-settled proposition that the unexplained killing of one person by another is presumed to be malicious, and therefore murder." *Blanks v. State*, 547 So. 2d 29, 33 (Miss. 1989) (citations omitted). However, "[t]his presumption has no application where there are eyewitnesses to the slaying other than the accused, who relate the facts and circumstances surrounding the killing." *Blanks*, 547 So. 2d at 33 (citing *Tigner v. State*, 478 So. 2d 293 (Miss. 1985); *Reed v. State*, 229 Miss. 440, 91 So. 2d 269 (1957)). In the case sub judice, since there were no eyewitnesses other than the accused, this presumption is applicable, but "[w]here the only eyewitness to the slaying is the accused, another rule of law becomes applicable, the familiar *Weathersby* Rule . . . ." *Id.* Thus, Walters also asserts that the *Weathersby* Rule is applicable in the instant case to support his claim that the evidence could only support a conviction for manslaughter.

¶40. In *Weathersby v. State*, this Court stated:

> [W]here the defendant or the defendant's witnesses are the only witnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Weathersby v. State*, 165 Miss. 207, 209, 147 So. 481, 482 (1933); *see also Wetz v. State*, 503 So. 2d 803, 808 (Miss. 1987); *Weeks v. State*, 493 So. 2d 1280, 1283 (Miss. 1986); *Harveston v. State*, 493 So. 2d 365, 370-71 (Miss. 1986). "A defendant who met the *Weathersby* Rule would be entitled to a directed verdict of acquittal." *Blanks*, 547 So. 2d at 33. However, this Court has held that "where the accused, following the slaying, gives conflicting versions of how the killing took place, or *initially denies the act,*" then the *Weathersby* Rule is not applicable. *Id.* (citing *Smith v. State*, 530 So. 2d 155 (Miss. 1988); *Burge v. State*, 472 So. 2d 392 (Miss. 1985); *May v. State*, 460 So. 2d 778 (Miss. 1984)). In the case sub judice, Walters initially denied killing McCoy, thus the *Weathersby* Rule has no application in this case. Thus, "[i]n those cases in which the defendant is the only eyewitness to the slaying, and in which the *Weathersby* Rule is inapplicable (i.e., the defendant does not secure a directed verdict of acquittal), it then becomes a jury issue as to whether to believe or not believe the defendant's testimony of how the slaying occurred, and to either convict or acquit." *Id.* at 33-34 (citations omitted).

¶41. Looking at the physical evidence, i.e., the twenty four stab and slash wounds sustained by McCoy; numerous abrasions, lacerations, and bites; and ultimately, a fatal blow to the back of the head possibly made by a piece of concrete, and Walters' own confession in a light most favorable to the verdict, we can not conclude that the evidence is consistent with any crime other than the crime of murder. While Walters alleges that he acted in self defense, the police did not observe any defensive wounds on Walters' body. Further, McCoy was only 5'3-1/2" tall and weighed 125 pounds while Walters was approximately 5'8" to 5'9" and weighed over two hundred pounds. This evidence is sufficient to negate Walters' claim of self-defense and support the jury's finding of malice and, ultimately, its verdict that Walters was guilty of murder.

¶42. The jury was given instructions defining the crimes of both murder and manslaughter as well as instructions defining the terms "malice" and "deliberate design" to kill. The jury returned a unanimous verdict of guilty of murder against Walters, and we find ample evidence, viewed in the light most favorable to the State, to support the jury's verdict. As a result, this assignment of error is without merit.

## V. WHETHER WALTERS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

¶43. Walters finally asserts that his trial attorneys did not provide effective assistance of counsel and that he was prejudiced thereby. In particular, he assails counsel's failure to file any pre-trial motions or to seek funds for the appointment of an independent investigator; that he did not seek the appointment of or funds for an independent pathologist and/or odontologist; that he failed to object to hearsay evidence at trial; and that he failed to follow through on Walters' 1992 post-trial motions and appeal of his conviction.

¶44. In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove (1) that his attorney's overall performance was deficient and (2) that the deficient performance, if any, was so substantial as to prejudice the defendant and deprive him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984); *Wilcher v. State*, 479 So. 2d 710, 713 (Miss. 1985); *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984). This Court looks at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial. *Carney v. State*, 525 So. 2d 776, 780 (Miss. 1988); *Read v. State*, 430 So. 2d 832, 839 (Miss. 1983). "Judicial scrutiny of counsel's performance [is] highly deferential." *Strickland*, 466 U.S. at 689. There is also a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Carney*, 525 So. 2d at 780; *Gilliard v. State*, 462 So. 2d 710, 714 (Miss. 1985). Only where it is reasonably probable that, but for the attorney's errors, the outcome of the trial would have been different will this Court find that counsel's performance was deficient. *Dickey v. State*, 662 So. 2d 1106, 1109 (Miss. 1995); *Reed v. State*, 536 So. 2d 1336, 1339 (Miss. 1988).

¶45. Looking first at Walters' claim that his attorney failed to file any pre-trial motions to appoint or obtain funds for an independent investigator, forensic pathologist or odontologist, there is no evidence that his attorney's conduct fell outside the realm of reasonable professional assistance in seeking further expert assistance, or that Walters' case was prejudiced thereby. By analogy, when determining whether a defendant's right to a fair trial was denied by the circuit court's denial of a defendant's motion to appoint or provide funds for an expert, this Court has considered "whether and to what degree the defendant had access to the State's experts, whether the defendant had the opportunity to cross-examine those experts, and lack of prejudice or incompetence of the State's experts." *Green v. State*, 631 So. 2d 167, 171 (Miss. 1994). While Walters does not enlighten this Court as to what these experts might have revealed or the extent to which the State's experts were made available to him, the record clearly shows that he was afforded, and took advantage of, the opportunity to cross-examine them. Some of the forensic pathologist's testimony actually was beneficial to Walters' case: agreeing that McCoy was "knee-walking drunk" at the time of her death, noting the exaggerated effect alcohol has on diabetics, and determining that all but one of the many

stab wounds she sustained were nonlethal. As to the odontologist, bite mark evidence was but one small bit of evidence identifying Walters. *See **Harrison v. State***, 635 So. 2d 894 (Miss.1994) (failure to provide funds requested by defendant for expert odontologist was violation of due process where only evidence against him came from testimony of State's expert). Thus, we fail to find in this regard where Walters' counsel was deficient or, even if deficient, how Walters was prejudiced by such deficiency.

¶46. Walters further contends that his attorney should have objected to hearsay testimony at trial by Detective DeJarnette regarding hearsay testimony that he was in a rage and arguing with McCoy at the S & B Lounge. While an objection might have been proper, although the record does not indicate whether the sources were unidentified or unavailable as witnesses, it cannot be said that a mere objection to that testimony would have changed the outcome of the trial. Thus, we fail to find where Walters was prejudiced by his counsel's failure to object to any hearsay testimony.

¶47. Finally, Walters asserts that his attorney was deficient in failing to pursue his post-trial motions and his appeal to this Court. The April 3, 1996 hearing on Walters' motion for a new trial provides no clue as to why his attorney failed to secure a ruling on his December 30, 1992 motion for a new trial or j.n.o.v. or why he failed to pursue an appeal. The attorney merely denied receiving anything from Walters indicating his desire to appeal.[2] It hardly seems within the realm of competent professional assistance for an attorney to fail to obtain a ruling on a client's motion for a new trial. However, here on appeal now, we find no merit to any of Walters' claims that would warrant a new trial, and thus, Walters is unable to show how he is prejudiced by his attorney's failure to have the trial court rule on the motion for a new trial. As a result, we find that Walters was not denied effective assistance of counsel, and thus, this issue is without merit.

## CONCLUSION

¶48. We affirm the trial court's conviction of Walters for murder for the following reasons: (1) the trial court did not err by allowing the introduction into evidence the videotape of the crime scene because the probative value outweighed the prejudicial effect due to a lack of other still photographs of the crime scene and the necessity to negate Walters' claim of self defense; (2) the prosecutor's comments during closing arguments were not an improper comment on Walters' failure to testify on his own behalf in violation of his right against self-incrimination, and the trial court's admonishment of the prosecutor's brandishing of a knife during closing arguments was a proper response and does not constitute reversible error; (3) the prosecutor did not exercise its peremptory challenges in a discriminatory manner; (4) the trial court properly denied Walters' motion for a directed verdict, and the jury's verdict of guilty of murder was supported by sufficient evidence; and (5) Walters was not denied effective assistance of counsel.

¶49. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT AS AN HABITUAL OFFENDER IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT BENEFIT OF PAROLE AFFIRMED.**

**ROBERTS, MILLS, AND WALLER, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, C.J., SULLIVAN, P.J., AND BANKS, J. PITTMAN, P.J., NOT PARTICIPATING.**

**McRAE, JUSTICE, DISSENTING:**

¶50. I disagree with the majority's conclusion that the circuit court properly admitted into evidence the crime scene videotape and that Walters was not prejudiced thereby. There is no merit to the State's assertion that the videotape was necessary to rebut Walters' theory of self-defense. Further, the circuit court could have, and should have, limited the jury's view of the tape to those segments it found to have some probative value. Finally, to allow the videotape into evidence merely because the State claimed to have overexposed its still photographs sets an unfortunate precedent for introduction of questionable evidence. Accordingly, I dissent.

¶51. The circuit court allowed the State to introduce into evidence Exhibit 1, a videotape of the crime scene, despite the judge's acknowledgment that the tape depicted a "pretty grotesque scene" and his concern that allowing the jury to view the video over and over would be prejudicial. The videotape takes the viewer along a path through the woods leading up to McCoy's partially nude and already-decomposing body, lying face-down in the leaves. Flies are buzzing around and when investigators turn the body face up, the camera focuses first on the victim's bloodied face and then shows authorities, as defense counsel stated in his objection,"pulling which [sic] appears to be some sort of animal type creatures or jelly substance from around her neck." Although Detective Danny Rigel provided a detailed narrative of the video while it was played for the jury, he did not describe what was being examined at that point. However, when the volume on the videotape is turned up, one investigator is heard commenting to the others, "This here's where the flies been laying eggs . . . ."

¶52. Walters argued that the tape is more prejudicial than probative. The State contends that the videotape is necessary because it is the only evidence of how the body was found, since the photographs taken at the scene were overexposed and consequently discarded. The majority erroneously finds that the tape's probative value outweighed any prejudicial effect because of the absence of still photographs showing the crime scene and the condition in which the body was found, and further that it was the *only* evidence that the State had to negate Watts' claim of self-defense.

¶53. This Court has held that the same standards used in determining the admissibility of photographs are applicable to the admission of videotapes. ***Blue v. State***, 674 So. 2d 1184, 1211 (Miss. 1996); ***Holland v. State***, 587 So. 2d 848, 864 (Miss. 1991). "[T]he admissibility of photographs rests within the sound discretion of the trial judge, whose decision will be upheld absent abuse of that discretion . . . Yet, photographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence." ***McFee v. State***, 511 So. 2d 130, 135 (Miss. 1987). In light of ***McFee*** and Miss. R. Evid. 403,[(3)] a court, when considering admissibility, must also consider (1) whether the proof is absolute or in doubt as to identity of the guilty party, and (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury. ***McNeal v. State***, 551 So. 2d 151, 159 (Miss. 1989)(finding that gruesome photographs of a maggot-infested body were "devoid of any evidentiary purpose"). *See also* ***Williams v. State***, 544 So. 2d 782, 785 (Miss. 1987) ("[G]enerally, the admissibility of photo[s] is within the sound discretion of the trial judge and the admission is proper, so long as their introduction serves some useful evidentiary purpose.").

¶54. Looking first at the probative value of the videotape, the State argued that the tape was

necessary to negate Walters' claim of self-defense, illustrating the stab wounds on McCoy's back and "how she was tied up and drug." Contrary to the majority's finding, there simply is no merit to that argument. The tape first was shown at the very beginning of the trial to illustrate the crime scene and not to refute a claim of self-defense that had not yet been put before the jury. Asked in chambers at trial how the video tape would serve to negate Walter's claim of self-dense, the State responded:

> The extensive wounds, laying her out in the ditch, covering her up, the leaves, the position the body's in, leaving her in that position, where the wound's [sic] inflicted to the back, and she was nude.

There is ample testimony in the record by the forensic pathologist and investigating authorities as to the number of wounds on the body. That McCoy was partially nude hardly is relevant to the self-defense argument; Walter's confessions state that they had sex prior to tussling in the woods and the pathologist's testimony indicated that McCoy had had sexual intercourse prior to her death. Whether she was "tied up and drug" or how she was arranged in the leaves is hardly relevant to the issue of self-defense; it shows only what happened after she was comatose or dead. That the stab wounds on McCoy's back are well-illustrated in the video further does nothing to document the cause of death. Dr. Hayne, the forensic pathologist, testified that none of the stab wounds or other lacerations on McCoy's body were lethal; rather, death was caused by a blow to the back of her head. The videotape, therefore, is not probative in any way of the matters that the State sought to prove or negate, specifically Walters' intent. It is repetitive and presents cumulative evidence of the victim's wounds and of the fact that she had engaged in sexual intercourse prior to her death. Further, there was substantial evidence at presented at trial which would refute Walters' claim of self-defense, including the size difference between Walters and Stine and the fact that Stine had a near fatal blood/alcohol level of .39. Thus, the majority erroneously has taken the State's argument one step further, in finding that the videotape was the *only* evidence which negated Walters' claim of self-defense.

¶55. Further, the mere fact that the still photographs of the crime scene allegedly were unusable and discarded should not warrant presentation of the entire unedited videotape to the jury. Parts of the videotape shown to the jury are particularly gruesome and without any probative value. No explanation was provided as to the cause or relevance of those aspects. As this Court observed in McNeal, "we believe that the state could have shown the angle and entry of the bullet without a full-color, close-up view of the maggot-infested, decomposed skull." Similarly, in the case *sub judice*, the State could have presented evidence negating Walters' claim of self-defense or demonstrating his intent without a full-color, close-up view of the more gruesome effects of decomposition on non-lethal neck wounds. Recognizing that the still photographs taken at the scene allegedly were over-exposed and discarded, color prints of any relevant crime scene evidence easily could have been made from the videotape. Moreover, in light of the trial court's concerns about its potential prejudicial effect, the State could have been limited in the segments of the videotape it could show the jury or the jury could have been prohibited from viewing it during deliberations. Compare the consideration given to minimizing any prejudicial effect of a particularly graphic videotape in **Underwood v. State,** 708 So. 2d 18 (Miss. 1998), where

> Judge Toney allowed the prosecution to play a video tape for the jury of Mrs. Harris's body as it was found by investigators. After hearing the arguments from counsel, the judge determined

that the jury would not be allowed to take the tape into deliberations, because he instructed the prosecutor to stop the tape before the body was turned over. The portion of the video tape shown to the jury depicts little more than State's Exhibit 5, the photograph of Mrs. Harris's body at the crime scene. The only additional footage is a shot of Mrs. Harris's ear, revealing that maggots had infested her ear. Judge Toney allowed the prosecution to show the tape through a closeup of the ear, because that evidence was used to help establish the time of death. Out of precaution, however, Judge Toney ruled that the remainder of the video tape, showing the investigators' further examination of the body after turning it over, would not be shown to the jury.

*Id.* at 34. Given the inflammatory nature of segments of the videotape in the case *sub judice*, its lack of probative value, and the circuit court's concern about its potentially prejudicial effects, allowing the jury to view the entire videotape without any restrictions was an abuse of discretion.

¶56. Allowing the videotape into evidence largely because the State allegedly underexposed its film, threw the pictures away and didn't have the technical savvy to have still pictures made from the videotape has the unfortunate effect of rewarding the prosecution for its failure to carefully preserve evidence it deems necessary for the presentation of its case. It has ramifications in civil as well as criminal proceedings where either party might unfairly benefit from -- or be prejudiced by -- the subversion of the Rule 403 balancing test to allow the introduction of evidence that otherwise would be inadmissible had some other evidence not been lost or tainted. To the contrary, we should be sending a message to parties that evidence does not achieve a level of unfettered admissibility merely because it is the allegedly the "only" evidence available, and not allowing an "excuse" to allow the introduction of highly inflammatory and prejudicial material.

¶57. Accordingly, I dissent.

**PRATHER, C.J., SULLIVAN, P.J., AND BANKS, J., JOIN THIS OPINION.**

1. Rule 403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Miss. R. Evid. 403.

2. The record indicates that Walters expressed his desire to appeal his conviction and sentence at his sentencing hearing.

3. Rule 403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."